## DAVENPORT v. DISTRICT OF COLUMBIA.

### No. 628.

Municipal Court of Appeals for the District of Columbia.

Sept. 21, 1948.

---

Saul G. Lichtenberg, of Washington, D. C., for appellant.

Edward A. Beard, Asst. Corp. Counsel, of Washington, D. C. (Vernon E. West, Corp. Counsel, and Chester H. Gray, Principal Asst. Corp. Counsel and William S. Cheatham, Asst. Corp. Counsel, all of Washington, D. C., on the brief), for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

Appellant Davenport was convicted of vagrancy and sentenced to serve 90 days in jail. He has appealed, assigning as error the finding of guilt by the trial court, the admission of certain evidence, and the failure to quash the arrest. He further contends that the entire proceedings constituted double jeopardy within the meaning of the federal Constitution, Amendment 5.

The District of Columbia vagrancy statute[1] is divided into nine subsections, each of which states a different course of conduct or way of life which if followed constitutes the offender a vagrant. Davenport was charged under subsection 3, defining as a vagrant: "Any person leading an immoral or profligate life who has no lawful employment and who has no lawful means of support realized from a lawful occupation or source."

Nine different witnesses testified as to Davenport's conduct between May 11 and December 17, 1947, the period covered by the information. A sergeant of the Union Station police testified that he observed Davenport at the Station during the entire

---

[1] Code 1940, Supp. V, § 22—3302.

period on an average of about four times every week, mostly at night, and had seen him sell whiskey at the Station without a license. A 15-year-old girl testified that at 7:30 a. m. one morning at the Station he made indecent remarks to her, offered her money to commit an immoral act and, when she rejected his advances hit her with a towel. A United States park policeman told of observing Davenport peeping into a window of a girls' dormitory in west Potomac Park. A woman described how appellant had entered a clearly marked ladies' rest room and embarrassed her while she was using the room. A 16-year-old school girl testified that Davenport had approached her in a telephone booth at the Union Station and offered her money to commit an immoral act. Davenport's language quoted by the two girls as having been addressed to them can only be described as lewd and indecent. Another Union Station officer described seeing Davenport approach two soldiers in the Union Station concourse and that Davenport had sold them liquor from a supply he kept in a locker at the Station. He also said that he had observed Davenport "lots of times in the afternoon and evening and nighttime around the Union Station." A metropolitan police officer, who had served a warrant on Davenport for selling liquor without a license, testified he had observed Davenport at various times in the daytime and late at night at the Station. Another Station employee testified he had observed him frequently "roaming around" the Union Station talking to soldiers and that when questioned as to what he was doing at the Station had given such answers as "I have to make some money to pay my fine next week"; "I am resting"; "I have been swimming"; "I am selling liquor cheaper than the drug store"; "I am nervous and can't sleep." Another Station policeman enumerated approximately 25 different occasions during September and October 1947, mostly after midnight and as late as 5:30 a. m., when he had talked with Davenport at the Station. When questioned Davenport gave such explanations for his presence as "I

am selling liquor"; "I am in the liquor business"; "I am on a sight-seeing trip"; "I came to get some sleep"; "I came for a coke"; "I am not doing anything"; "I came for a shave" (at 4:30 a. m.); "I am going to Hollywood." On one of those occasions this officer arrested Davenport for drinking liquor in public.

Davenport himself testified that in the summer months he made money as a caddy at a local country club; that he bought and sold rings and watches, mostly at the Union Station. He also stated that he had sold whiskey in the Union Station for the past four or five months, adding "That's the way I make my living." He also said that he had made money playing cards, and, when asked by his own counsel what he was doing at the time of trial, he stated he was "working in gambling houses." He had no records or other evidence to support his statements regarding his alleged caddying activities and his answers to questions about the golf course showed lack of familiarity with its layout. He produced no license to deal in secondhand personal property nor records of such transactions as are required by the District of Columbia police regulations.

■ Webster's Dictionary [2] defines "profligate" as "completely given up to dissipation and licentiousness; broken down in morals and decency." It has been said that "'Immorality' is not necessarily confined to matters sexual in their nature; it may be that which is contra bonos mores; or not moral, inconsistent with rectitude, purity, or good morals; contrary to conscience or moral law; wicked; vicious; licentious, as, an immoral man or deed. Its synonyms are: Corrupt, indecent, depraved, dissolute; and its antonyms are: Decent, upright, good, right. * * *" [3] We have no doubt that the evidence furnished ample support for the finding of the trial court that Davenport came within these definitions and thus was leading an immoral or profligate life.

■ Appellant urges, however, that the government did not prove the other element

[2] Webster's Dictionary, 2d Ed. unabridged.

[3] Schuman v. Pickert, 277 Mich. 225, 269 N.W. 152, 154.

of the offense, namely, that he had no lawful employment and no lawful means of support realized from a lawful occupation or source. But under the circumstances and since the other element of the offense was proven, the negative evidence adduced showing the illegality of Davenport's principal source of income clearly was sufficient to shift to him the burden of going forward with the proof. The burden was upon him to establish, and not upon the government to disprove, legitimacy of employment.[4] We must hold that the trial court was justified in ruling that he had failed to sustain this burden.

▆▆▆ Appellant next urges that, since he was arrested upon a warrant charging disorderly conduct and the charge of vagrancy was later placed against him, his motion to quash the arrest should have been granted. This contention is answered by the well settled rule that a court will not inquire into the manner in which an accused is brought before it.[5] The arrest was admittedly a legal one, but it is argued that the alteration in the grounds from warrant to information is a fatal error which deprived the court of jurisdiction. Such is not the law. The validity of a warrant is not to be compared with the validity of an indictment; even a false arrest does not necessarily deprive a court of jurisdiction.[6] A fortiori the mere irregularity of trying the accused on a charge different from that for which he was validly arrested is no defense to the latter charge.[7]

Since a substantial part of the testimony as to Davenport's habits and conduct in the Station was given by employees of the terminal, it is argued that these witnesses are biased and that their testimony should have been excluded. Appellant's counsel also contends that even if this testimony was validly admitted that his right of cross-examination was unduly restricted.

▆▆▆ The early English theory was that any person having a pecuniary interest in the outcome of a case, including the parties, was so biased as to be unworthy of belief and his testimony was excluded. This theory has long since been discarded and bias or interest goes only to the weight of the testimony rather than its competency.[8] Appellant's other point, however, requires more consideration. A witness' bias, interest, or prejudice are always pertinent and are apppropriate subjects for cross-examination.[9] Generally a wide latitude is allowed for cross-examination directed to such proof, but its scope is not unlimited. The extent rests largely in the sound judgment of the trial court and its exercise of discretion is not subject to review except upon clear showing of abuse.[10] It is true that a court may not limit cross-examination upon a pertinent subject at the outset, but after a substantial exploration of the subject a judge is within his rights in limiting an examination which may become needlessly protracted.[11] In the case at bar the record does not disclose any attempt to cut off the cross-examination in limine. Quite to the contrary, defendant's counsel brought out fully the connection

---

[4] Rogers v. District of Columbia, D.C. Mun.App., 31 A.2d 649; cf. Burns v. District of Columbia, D.C.Mun.App., 34 A.2d 714; Clark v. District of Columbia, D.C.Mun.App., 34 A.2d 711.

[5] 22 C.J.S., Criminal Law, § 143; 14 Am.Jur., Criminal Law, § 219.

[6] Albrecht v. United States, 273 U.S. 1, 47 S.Ct. 250, 71 L.Ed. 505; Sheehan v. Huff, 78 U.S.App.D.C. 391, 142 F.2d 81, certiorari denied 322 U.S. 764, 64 S.Ct. 1287, 88 L.Ed. 1591; Note 165 A. L.R. 948.

[7] Tracy v. State, 25 Ala.App. 417, 147 So. 685; In re Fitton, 68 Vt. 297, 35 A. 319.

[8] 2 Wigmore, Evidence (3rd ed.), § 576.

[9] Underhill's Criminal Evidence (4th ed.) § 437.

[10] Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; State v. Robinson, 24 Wash.2d 909, 167 P.2d 986; Hengstler v. State, 207 Ind. 28, 189 N.E. 623; 3 Wharton's Criminal Evidence (11th ed.) § 1308; see also Note 11 infra.

[11] District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843; J. E. Hanger, Inc., v. United States, 81 U.S.App.D.C. 408, 160 F.2d 8; Lindsey v. United States, 77 U.S.App.D.C. 1, 133 F.2d 368; Fleming v. Husted, 8 Cir., 164 F.2d 65, certiorari denied 333 U.S. 843, 68 S.Ct. 661; State v. Talamante, 50 N.M. 6, 165 P.2d 812; State v. Ford, 286 Mo. 624, 228 S.W. 480.

between the various witnesses and the terminal company. We fail to see how further examination could have done more than belabor the point.

Davenport also pleads former jeopardy. The basis urged is that the prosecution, in the course of proving that defendant led "an immoral or profligate life," introduced evidence of acts by the defendant which had led to prior prosecutions for disorderly conduct, indecent exposure, solicitation to prostitution, violation of the A.B.C. laws, and drinking in public. Some of these charges had been dismissed, and the ones in which a conviction had been secured were then pending on appeal. The testimony and witnesses employed to prove these incidents were the same, in part at least, as those used in the former cases.

■■■■ The argument of double jeopardy is specious on its face. The constitutional guarantee is not against mere repetition of testimony in trials for different offenses, but against being twice subjected to jeopardy for the same offense.[12] The fact that a defendant has been indicted or tried for another offense does not render incompetent otherwise admissible evidence.[13]

■■■■ The test of double jeopardy, if sometimes complex in its application, is nevertheless clear in its enunciation. The case in which a defendant may successfully plead former jeopardy must be identical in law and in fact with a former case in which he was put in jeopardy. This rule is variously stated as: that the first indictment sufficiently described the second offense so that defendant could have been convicted of the second upon the trial of the first; or that the evidence required to prove the two offenses was the same.[14] However, this rule is not interpreted to mean that only one offense and charge can arise from a single set of facts. The law is replete with instances wherein two or more offenses against the statutes or common law of the same sovereign may result from a single factual transaction.[15]

■■■■ However, it is not necessary here to indulge in the nice reasoning employed by courts faced with cases in the penumbra area. A common sense comparison of the crime of vagrancy with the other offenses utilized by defendant to support his plea of former jeopardy indicates the fallacy of the argument. The defendant could not have been convicted of vagrancy upon the trial of any of the former offenses, nor was the basic evidence required for proof the same as in the present case. The necessity of proving an additional element is fatal to the plea of former jeopardy.[16]

A careful examination of the record discloses no prejudicial error, and the judgment of the trial court is

Affirmed.

[12] United States v. Brimsdon, D.C.W. D.Mo., 23 F.Supp. 510.

[13] Witters v. United States, 70 App.D. C. 316, 106 F.2d 837, 125 A.L.R. 1031.

[14] District of Columbia v. Buckley, 75 U.S.App.D.C. 301, 128 F.2d 17, certiorari denied 317 U.S. 658, 63 S.Ct. 57, 87 L.Ed. 529; Monroe v. United States, 56 App.D.C. 80, 10 F.2d 645; Nordlinger v. United States, 24 App.D.C. 406, 70 L. R.A. 227; 2 Wharton's Criminal Evidence, 11th Ed., § 860; 15 Am.Jur., Criminal Law, § 380.

[15] Upshaw v. United States, 10 Cir., 157 F.2d 716; Gilmore v. United States, 10 Cir., 124 F.2d 537, certiorari denied 316 U.S. 661, 62 S.Ct. 941, 86 L.Ed. 1738; Hewitt v. United States, 8 Cir., 110 F.2d 1, certiorari denied 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409. For further examples see: 22 C.J.S., Criminal Law, § 295(f).

[16] Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306; Gavieres v. United States, 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489; District of Columbia v. Buckley, 75 U.S.App.D.C. 301, 128 F.2d 17, certiorari denied 317 U.S. 658, 63 S.Ct. 57, 87 L.Ed. 529; Sims v. Rives, 66 App.D.C. 24, 84 F. 2d 871, certiorari denied 298 U.S. 682, 56 S.Ct. 960, 80 L.Ed. 1402; Bartlett v. United States, 10 Cir., 166 F.2d 928; Hewitt v. United States, 8 Cir., 110 F. 2d 1, certiorari denied 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409; cf. Robinson v. United States, 10 Cir., 143 F.2d 276; Gray v. United States, 8 Cir., 14 F.2d 366.