**Hattie Mae RICKS, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 20919.

United States Court of Appeals
District of Columbia Circuit.

Argued May 17, 1968.

Decided Dec. 23, 1968.

Messrs. Monroe H. Freedman and Sol Rosen, Washington, D. C., with whom Mr. Ralph J. Temple, Washington, D. C., was on the brief, for appellant.

Mr. Ted D. Kuemmerling, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee.

Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Nearly every state in the Union has ventured to regulate in a criminal context an assortment of conduct characteristically grouped under the denomination "vagrancy." [1] Congress, in like vein, has enacted the two statutes currently in operation in the District of Columbia commonly referred to as the "general vagrancy" [2] and "narcotic vagrancy" [3] laws. On this appeal we came face-to-face with claims of unconstitutionality directed toward the former. In a companion case,[4] decided today, we deal with similar challenges to the latter.

The legislation now before us categorizes eight "classes of persons" who "shall be deemed vagrants in the District of Columbia," [5] and specifies fine and imprisonment as the punishment for vagrancy.[6] The District's police department has administratively implemented these provisions with procedures, called "vagrancy observations," which are utilized prior to vagrancy arrests. An observation, as the word connotes, consists in police surveillance of an individual, followed by questioning and the assembly of information on a vagrancy observation form.[7] The form is turned in at a pre-

1. For an analysis of 48 state vagrancy statutes, see Note, The Vagrancy Concept Reconsidered: Problems And Abuses Of Status Criminality, 37 N.Y.U.L. Rev. 102, 108–114 (1962). See also Amsterdam, Federal Constitutional Restrictions On The Punishment Of Crimes Of Status, Crimes of General Obnoxiousness, Crimes Of Displeasing Police Officers, And The Like, 3 Crim.L.Bull. 205 (1968); Douglas, Vagrancy And Arrest On Suspicion, 70 Yale L.J. 1 (1960); Foote, Vagrancy-Type Law And Its Administration, 104 U.Pa.L.Rev. 603 (1956); Lacey, Vagrancy And Other Crimes of Personal Condition, 66 Harv. L.Rev. 1203 (1953); McKay, Poverty And The Administration of Criminal Justice, 35 U.Colo.L.Rev. 323, 324–26 (1963); Perkins, The Vagrancy Concept, 9 Hastings L.J. 237 (1958); Sher-

ry, Vagrants, Rogues And Vagabonds— Old Concepts In Need of Revision, 48 Calif.L.Rev. 557 (1960); Note, Use Of Vagrancy-Type Laws For Arrest And Detention of Suspicious Persons, 59 Yale L.J. 1351 (1950).

2. D.C.Code §§ 22–3302 to 22–3306 (1967 ed.).

3. D.C.Code § 33–416a (1967 ed.).

4. Ricks v. United States, 134 U.S.App. D.C. ——, 414 F.2d 1111.

5. D.C.Code § 22–3302 (1967 ed.).

6. D.C.Code § 22–3304 (1967 ed.).

7. See note 10, infra.

cinct station and circulated to other precincts with substantial vice problems. At least three observations within a 45-day period are customarily made before the person observed is arrested for vagrancy.[8]

On January 22, 1966, at 3:08 a. m., two police officers, patrolling a section of the inner city described as a "den of vice," saw appellant standing in the doorway of a "known house of ill fame." The officers recognized appellant as a "known and convicted felon, thief, prostitute, vagrant, and narcotics user."[9] She was "observed"[10] approaching a male pedestrian and walking with him toward a neighboring "house of ill fame." The officers intercepted the pair and asked appellant a battery of questions concerning her reasons for being on the streets at that hour, to which appellant responded that she was on her way to "Slim's room" to get clothes which she left there. Inquiry was also made as to her employment status, the last time she had "turned a trick,"[11] and her use of "junk."[12] Appellant said that she was not employed, was no longer using "junk," and had not "turned tricks" since the previous month. Compliably with the officers' request, she rolled up her sleeves, thereby revealing two needle marks on her left arm.

Four days later, an around-the-clock police vigil again focused on appellant.

At 1:04 a. m. she was spotted "flagging several automobiles" carrying male occupants, and was overheard using the jargon of professional prostitutes soliciting customers. She asked one male driver if he was "sporting" and invited him to accompany her to a house because she "didn't turn any tricks in any car." She was again questioned by the police and, for the second time, her answers intimated nothing. Marks were perceived on appellant's left arm when, in response to an officer's request, she exposed it.

On January 29, 1966, seven days after the first observation, appellant was seen at 4:10 in the morning walking back and forth from a street corner. Her meandering apparently aroused the interest of a police officer who kept her in view for approximately ten minutes. Then followed another round of interrogation, and appellant was informed of the vagrancy law and told to go home.

The final observation of appellant was made by the officer who had conducted the first. On February 11, 1966, between 1:30 and 3:00 a. m., he detected appellant standing on a street corner and stopping male pedestrians as they passed. This time the officer placed appellant under arrest.

The information upon which appellant was prosecuted charged that appellant

8. *Id.*

9. It was disclosed at appellant's trial that in 1959 she was convicted of soliciting prostitution and of violating the Uniform Narcotics Act, and in 1965 of petit larceny. The record in Ricks v. United States, *supra* note 4, reveals additional convictions for violations of the Harrison Act in 1961 and of several violations of the narcotic vagrancy statute.

10. A number of years ago, the Corporation Counsel advised the police department as to the type and quantum of evidence deemed essential to successful prosecutions under the vagrancy statute. In turn, a memorandum from the Deputy Chief of Police, addressed on March 23, 1954, to the entire force, imparted to law enforcement officers information as to the number and features of observations to be made in each type of case encompassed by the law. The memorandum stated that a suspected prostitute under observation should be engaged in conversation to determine her reason for being on the street at late hours, and that a record should be kept of the observations and conversations so that "the explanations given by the suspected person * * * may be used in court." Testimony at the trial of this case indicated that suspected vagrants are to be observed three times over a period of 45 days. As the text delineates, appellant was observed four times before she was arrested.

11. In the vernacular, the act of prostitution.

12. In context, heroin.

was a vagrant within three of the statute's definitions of the term:[13]

"The following classes of persons shall be deemed vagrants in the District of Columbia:

"(1) Any person known to be a pickpocket, thief, burglar, confidence operator, or felon, either by his own confession or by his having been convicted in the District of Columbia or elsewhere of any one of such offenses or of any felony, and having no lawful employment and having no lawful means of support realized from a lawful occupation or source, and not giving a good account of himself when found loitering around in any park, highway, public building, or other public place, store, shop, or reservation, or at any public gathering or assembly. * * *

"(3) Any person leading an immoral or profligate life who has no lawful employment and who has no lawful means of support realized from a lawful occupation or source. * * *

"(8) Any person who wanders about the streets at late or unusual hours of the night without any visible or lawful business and not giving a good account of himself."

At the ensuing trial in the Court of General Sessions, appellant pressed motions to dismiss the information and for a judgment of acquittal on the ground, *inter alia*, that the vagrancy statute was unconstitutionally vague. Chief Judge Greene, in an illuminating opinion,[14] expounded the view that the statute was indeed invalid [15] but, recognizing the binding force of decisions of the District of Columbia Court of Appeals sustaining the statute, denied both motions and found appellant guilty as charged. The Court of Appeals affirmed,[16] adherently to its earlier pronouncements,[17] and we allowed this further appeal because of the obvious importance of the questions involved.

Appellant advances skillfully a number of bases upon which it is urged that the vagrancy law is unconstitutional, but we find it necessary to consider but one. The pervading difficulty, as we see it, is the legislative omission to provide a reasonable degree of guidance to citizens, the police and the courts as to just what constitutes the offenses with which appellant was charged. We reverse, holding that each of the statutory provisions upon which appellant's conviction rests is so vague as to infringe rights secured by the Fifth Amendment.

**I**

Reasonable precision in the definition of crime has been regarded as a desideratum by free people since the early days of the common law.[18] That

13. D.C.Code § 22–3302(1), (3), (8) (1967 ed.).

14. District of Columbia v. Ricks, 94 Wash. L.Rptr. 1269 (1966).

15. In the judge's view, "the real objection to the vagrancy law is that its basic design is one of preventive conviction imposed upon those who because of their background and behavior are more likely than the general public to commit crimes, and that the statute contemplates such convictions even though no overt criminal act has been committed or can be proved." District of Columbia v. Ricks, *supra* note 14, 94 Wash.L.Rptr. at 1269. "[T]his issue," he reasoned, "is inextricably intertwined with the vagueness question." *Id.* See the text of this opinion at pt. III.

16. Ricks v. United States, 228 A.2d 316 (D.C.App.1967), deciding also the litigation we today resolve in Ricks v. United States, *supra* note 4.

17. Hicks v. District of Columbia, 197 A. 2d 154 (D.C.App.1964); Beail v. District of Columbia, 82 A.2d 765 (D.C. Mun.App.1951), rev'd on other grounds 91 U.S.App.D.C. 110, 201 F.2d 176 (1952); Rogers v. District of Columbia, 31 A.2d 649 (D.C.Mun.App.1943). Cf. Wilson v. United States, 212 A.2d 805 (D.C.App.1965); Jenkins v. United States, 146 A.2d 444 (D.C.Mun.App. 1958).

18. See Pierce v. United States, 314 U.S. 306, 311, 62 S.Ct. 237, 86 L.Ed. 226 (1941); Aiglar, Legislation In Vague Or General Terms, 21 Mich.L.Rev. 831, 836 (1923).

precept, virtually from the birth of the Nation, has occupied a position of honor in the scheme of constitutional values,[19] and for justifications of the highest order. Fluid language which sweeps citizens under the penumbra of penal legislation without warning is abhorrent. The imposition of criminal liability for behavior which a person could not reasonably understand to be prohibited offends the most rudimentary considerations of fairness. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."[20] Thus "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."[21]

■■ Statutory vagueness has a distinctive impact, too, on human activity not essentially wicked and on the processes by which its criminality is to be appraised. "Liberty under law extends to the full range of conduct which the individual is free to pursue."[22] Since most people shy away from legal violations, personal liberty is unconstitutionally dampened when one can but doubt whether he is actually free to pursue particular conduct.[23] Moreover, definitional uncertainty is an open invitation, if indeed not inevitably an antecedent, to virtually unrestrained administration. "[A] law fails to meet the requirements of the Due Process Clause" not only "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits," but also if it "leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."[24] And legislation of that character "does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat."[25]

■ So it is that a criminal statute perishes on constitutional grounds when it leaves speculative the tests for ascertaining the line separating guilty from innocent acts. A reasonable degree of

19. See the cases cited *infra* notes 20 to 29.

20. Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939).

21. Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L. Ed. 322 (1926). See also United States v. Cardiff, 344 U.S. 174, 176–177, 73 S.Ct. 189, 97 L.Ed. 200 (1952); American Communications Ass'n v. Douds, 339 U.S. 382, 413, 70 S.Ct. 674, 94 L. Ed. 925 (1950).

22. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

23. Compare Aptheker v. Secretary of State, 378 U.S. 500, 515–517, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Shelton v. Tucker, 364 U.S. 479, 485–486, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Litigation in the free speech area has given this consideration broad play. See, *e.g.*, Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 684–685, 88 S.Ct. 1298, 20

L.Ed.2d 225 (1968); N.A.A.C.P. v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

24. Giaccio v. Pennsylvania, 382 U.S. 399, 402–403, 86 S.Ct. 518, 520, 15 L.Ed.2d 447 (1966). See also Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Herndon v. Lowry, 301 U.S. 242, 263, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); United States v. L. Cohen Grocery Co., 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

25. Shuttlesworth v. City of Birmingham, 382 U.S. 87, 90, 86 S.Ct. 211, 213, 15 L.Ed.2d 176 (1965), quoting Cox v. Louisiana, 379 U.S. 536, 579, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (separate opinion of Mr. Justice Black). See also N.A.A.C.P. v. Button, *supra* note 23, 371 U.S. at 435, 83 S.Ct. 328; Cantwell v. Connecticut, *supra* note 24, 310 U.S. at 308, 60 S.Ct. 900; Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); United States v. L. Cohen Grocery Co., *supra* note 24, 255 U.S. at 90–91, 41 S.Ct. 298.

certainty is prerequisite.[26]  Fair notice to those of ordinary intelligence is necessary.[27]  It is essential that the statutory language "conveys sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices." [28]

█ These are the critical elements of the void-for-vagueness doctrine; these are the criteria by which we must measure the statute at bar.  "Vague laws in any area suffer a constitutional infirmity," [29] and what the Constitution demands of other laws it exacts imperatively of those which undertake to punish vagrancy.[30]

## II

Appellant was prosecuted and convicted under three of the statutory subsections —(1), (3) and (8) of Section 22–3302— defining independent concepts of vagrancy.  Perusal of these subsections [31] discloses that each incorporates language precipitating problems in terms of the void-for-vagueness doctrine.  These provisions we must now individually scrutinize, in the light of pertinent constitutional principles, to ascertain whether they can pass muster.

### D.C.CODE § 22–3302(1)

The first type of vagrancy with which appellant was charged has four elements.  "Any person [1] known to be a * * * thief, * * * by his having been convicted in the District of Columbia * * * of * * * such [offense] * * * and [2] having no lawful employment and having no lawful means of support realized from a lawful occupation or source, and [3] not giving a good account of himself [4] when found loitering around in any * * * public place" is a vagrant.[32]  Appellant's prior conviction of petit larceny [33] supplies the first element,[34] and there was evidence on which the trial judge could find the sec-

26. Scull v. Virginia, 359 U.S. 344, 353, 79 S.Ct. 838, 3 L.Ed.2d 865 (1959); Flaxer v. United States, 358 U.S. 147, 151, 79 S.Ct. 191, 3 L.Ed.2d 183 (1958); Watkins v. United States, 354 U.S. 178, 208–209, 214–215, 217, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); Jordan v. De-George, 341 U.S. 223, 230, 71 S.Ct. 703, 95 L.Ed. 886 (1951); Lanzetta v. New Jersey, *supra* note 20, 306 U.S. at 453, 59 S.Ct. 618.

27. Bouie v. City of Columbia, 378 U.S. 347, 350–351, 84 S.Ct. 1697, 12 L.Ed. 2d 894 (1964); Wright v. Georgia, 373 U.S. 476, 491, 77 S.Ct. 1304, 1 L.Ed.2d 349 (1963); Roth v. United States, 354 U.S. 476, 491, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); United States v. Harris, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954); United States v. Cardiff, *supra* note 21, 344 U.S. at 176, 73 S.Ct. 189; United States v. Petrillo, 332 U.S. 1, at 7–8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).

28. United States v. Petrillo, *supra* note 27, 332 U.S. at 8, 67 S.Ct. at 1542.

29. Ashton v. Kentucky, 384 U.S. 195, 200, 86 S.Ct. 1407, 1410, 16 L.Ed.2d 469 (1966).

30. Vagrancy often includes within its sweep conduct which is otherwise innocuous and which involves no knowing violation of the law.  See Wilson v. United States, *supra* note 17, 212 A.2d at 806; Harris v. United States, 162 A.2d 503, 505 (D.C.Mun.App.1960); Jenkins v. United States, *supra* note 17, 146 A.2d at 447–448.  Statutory specificity becomes an increasing constitutional command where scienter is not an element of the criminal offense.  Boyce Motor Lines v. United States, 342 U.S. 337, 342, 72 S. Ct. 329, 96 L.Ed. 367 (1952); Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502–503, 45 S.Ct. 141, 69 L.Ed. 402 (1925); People v. Shifrin, 301 N.Y. 445, 94 N.E.2d 724, 725 (1950).  See also Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957).

31. Text *supra* following note 13.

32. D.C.Code § 22–3302(1) (1967 ed.) (bracketed numerals inserted).

33. Note 9, *supra*.

34. *Cf.* Harris v. District of Columbia, 102 U.S.App.D.C. 202, 203, 251 F.2d 913, 914 (1958).

ond.[35] But this subsection requires additionally that the accused be found loitering, and that he fail to give a good account of himself.[36] We are unable to perceive in these two elements the degree of specificity which due process enjoins upon legislative enactments that specify criminal offenses.

—*"Loitering"*

█ "Loitering" has not been defined legislatively. The District of Columbia Court of Appeals, adopting our definition of the term in another context,[37] has construed "loitering" in the vagrancy statute as meaning "to be slow in moving, to delay, to linger, to be dilatory, to spend time idly, to saunter, to lag behind."[38] In contrast to such seemingly innocuous conduct,[39] however, the court has also read subsection (1) to mean that "when one's wandering and conduct on the streets at late or unusual hours is such as to give reasonable grounds for a belief that his purpose for being on the street is not a legitimate one, we think that the law may validly require that he be called upon to account for his actions."[40] Further evidencing the susceptibility of the statutory language to divergent understandings, witnesses at appellant's trial likewise voiced widely differing interpretations of "loitering," ranging from the ostensibly innocent to the potentially criminal.[41] In the complete absence of statutory criteria by which the one can be objectively distinguished from the other, we find a fatal constitutional flaw.

In People v. Diaz,[42] a statute forbidding anyone "to lounge or loiter about

**35.** And see D.C.Code § 22–3303 (1967 ed.). We do not examine this element, or its counterpart in D.C.Code § 22–3302(3), from the viewpoint of other constitutional considerations because our disposition makes such an examination unnecessary, and not because we do not recognize the problems it foreshadows. See Long v. District Court, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966) ; Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L. Ed.2d 892 (1963) ; Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961) ; Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) ; Bailey v. Alabama, 219 U.S. 219, 241, 31 S.Ct. 145, 55 L.Ed. 191 (1911). See also Pollock v. Williams, 322 U.S. 4, 16, 64 S.Ct. 792, 88 L.Ed. 1095 (1944) ; Taylor v. Georgia, 315 U.S. 25, 29, 62 S.Ct. 415, 86 L.Ed. 615 (1942).

**36.** Kelley v. United States, 111 U.S.App. D.C. 396, 397, 298 F.2d 310, 311 (1961).

**37.** Stephens v. District of Columbia, 16 App.D.C. 279, 281 (1900).

**38.** Williams v. District of Columbia, 65 A.2d 924, 926 (D.C.Mun.App.1949). See also Harris v. District of Columbia, 132 A.2d 152, 154 (D.C.Mun.App.1957), rev'd on other grounds 102 U.S.App.D.C. 202, 251 F.2d 913 (1958).

**39.** See Kelley v. United States, *supra* note 36, 111 U.S.App.D.C. at 397, 298 F.2d at 311.

**40.** Harris v. District of Columbia, *supra* note 38, 132 A.2d at 154. See also Beail v. District of Columbia, *supra* note 17, 82 A.2d at 768.

**41.** One police officer considered loitering to consist in "walking back and forth from the corner and standing idle in a doorway." Another felt that it was "standing around in one spot, not going anywhere. Just standing there flagging automobiles." Still another said it was "[s]tanding idle in a doorway." The Chief of the Law Enforcement Division of the Corporation Counsel's office defined loitering as "a man hanging around a street corner he has been hanging around for an hour, we will say, there is no apparent purpose or motive for his being there. But, now, loitering in and of itself doesn't make me a vagrant. * * * You have got to have some acts on his part to indicate that he has an ulterior motive."

**42.** 4 N.Y.2d 469, 176 N.Y.S.2d 313, 151 N.E.2d 871 (1958).

Appellees point to People v. Merolla, 9 N.Y.2d 62, 211 N.Y.S.2d 155, 172 N. E.2d 541, cert. denied 365 U.S. 872, 81 S.Ct. 906, 5 L.Ed.2d 861 (1961), which sustained a statute prohibiting loitering about waterfront facilities. There the court found that the term, used in this context, possessed sufficient clarity because of the statute's "specification of facilities, their known utility and purpose, and the notoriety of the evils which have pervaded the area." 211 N.Y.S.2d at 159, 172 N.E.2d at 545. People v. Diaz, *supra* note 42, was distinguished.

any street or street corner" was held to be constitutionally infirm because it failed "to point up the prohibited act, either actual or threatened," [43] and thus did not differentiate "conduct calculated to harm and that which is essentially innocent." [44] Meeting the same fate was the statute involved in Hawaii v. Anduha,[45] which made it a misdemeanor for any person to "habitually loaf, loiter, and/or idle upon any public street or highway or in any public place." [46] Other courts treating similar enactments have reached the same conclusion.[47] These decisions undergird our conclusion that "loitering," as used in the subsection before us, is unconstitutionally vague.

—*"Not Giving A Good Account of Himself"*

■ We encounter difficulty not only with "loitering" but equally with the mandate of subsection (1) that the person loitering explain his activity in a manner that amounts to "giving a good account of himself." [48] The statute furnishes no standard by which it can be ascertained whether an explanation for particular conduct is "good," and decisions addressing "good account" provisions are but little more definitive. A refusal to account, says the District of

Columbia Court of Appeals, is a failure to give a good account,[49] and what the statute demands is not "a *mere account*" [50] but "one which is reasonably credible." [51] We do not disagree with the court's interpretation, but that is the extent to which prior judicial construction is informative.

The record discloses disparate opinions on "good account" entertained by those to whom enforcement of the statute is entrusted. Two police officers testified that a declination to answer questions is a failure to give a good account, but another officer said that this was a matter which the judge would have to decide. An officer avowed that "[g]ood account means that you are not out there for an illegal purpose," but another declared that the accounting is not good if the answers to an officer's questions do not satisfy the officer. To the Corporation Counsel's chief prosecutor whether a good account is given is a matter determinable only on the facts of the particular case.

We deem the "good account" provision much too loose to satisfy constitutional requirements. It takes but little reflection to bring to mind almost immediately the magnitude of the guesswork

---

43. 176 N.Y.S.2d at 315, 151 N.E.2d at 871, 872.

44. *Id.* 176 N.Y.S.2d at 316, 151 N.E.2d at 872.

45. 48 F.2d 171 (9th Cir. 1931).

46. "These words have no sinister meaning and imply no wrongdoing or misconduct on the part of those engaged in the prohibited practices. It is a matter of common knowledge, of which we must take judicial cognizance, that the majority of mankind spend a goodly part of their waking hours in whiling or idling the time away, and much of that time is spent on public streets and highways and in public places. Daylight saving laws have been enacted in order that those employed during the day may have more time at their disposal for recreation and pleasure; more time to idle, loiter, and loaf. On our streets daily are seen hundreds, and even thousands of idle men who have

nothing to do and no place to go, through no fault of their own, and are we to add to their misfortunes by declaring them lawbreakers and criminals?" 48 F.2d at 173.

47. Baker v. Bindner, 274 F.Supp. 658 (W. D.Ky.1967) ; City of St. Louis v. Gloner, 210 Mo. 502, 109 S.W. 30, 15 L.R.A., N.S., 973 (1908). But see *contra* In re Cregler, 56 Cal.2d 308, 14 Cal.Rptr. 289, 363 P.2d 305 (1961) ; State v. McCorvey, 262 Minn. 361, 114 N.W.2d 703 (1962).

48. D.C.Code § 22–3302(1) (1967 ed.).

49. Coley v. District of Columbia, 177 A.2d 889 (D.C.Mun.App.1962) ; Beail v. District of Columbia, *supra* note 17, 82 A. 2d at 768.

50. Harris v. District of Columbia, *supra* note 38, 132 A.2d at 154 (emphasis in original).

51. *Id.*

its application commonly entails. As one court recently put it:

"[T]he term 'good account' * * * leaves too much discretion in the hands of the police and the courts. It does not involve a certain standard, for what may be a good account to one person may very easily not be one to another. The word 'good' is especially subjective in nature and is used in our parlance in many different ways and contexts. Does it mean 'morally good' or does it mean 'lawful' in the sense that if one does not admit to a crime he has given a good account of himself? On the other hand, 'good account' may mean an account which puts the accused above suspicion or it may mean that his statement must give the officer sufficient credible information so as to negate probable cause.

"In addition, the statute imposes no time limit on 'good account.' Does it require a person to give a 'good account' of himself as of the moment the officer stops him or must he be prepared to explain and defend his conduct and whereabouts since he entered the state? One cannot tell how far back in time he may have to justify himself or his activities in order to avoid the criminal penalties of the statute." [52]

However viewed, subsection (1) is an investiture of enormous discretion in those who must administer it. Interdicted persons may tarry in public places only if willing to answer questions by police officers as to why they are there, and then only at the risk that their explanations might not appeal to their inquisitors. In Shuttlesworth v. City of Birmingham,[53] the Supreme Court held invalid an ordinance making it "unlawful for any person * * * to so stand, loiter, or walk upon any street or sidewalk * * * after having been requested by any police officer to move on," saying:

"Literally read, therefore, the second part of this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration. It 'does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat.' " [54]

We discern no significant difference from a constitutional standpoint between a law licensing one's presence on a public street upon a police officer's favorable judgment and one conditioning it upon the officer's satisfaction with the explanation as to why the person is there.

---

52. United States v. Margeson, 259 F.Supp. 256, 268–269 (E.D.Pa.1966). Similarly, in Baker v. Bindner, *supra* note 47, 274 F.Supp. at 664, the court said: "We do not believe that the requirement that an offender 'give a satisfactory account of himself' passes constitutional tests. It places sole determination in the discretion of the policeman on the beat. The standard of 'satisfactory account' is not certain, for what may be satisfactory to one may be unsatisfactory to another, and the meaning of the word 'satisfactory' itself is not susceptible of any standard of exactness. What kind of 'satisfactory'? Legal or moral satisfaction? What is the time limit to be embraced within the giving of 'a satisfactory account' that will excuse the offender in the sole discretion of the police officer who demands it? A satisfactory account at that instant or a satisfactory account of past activity? If of past activity, is that not guilt without proof? Does the mere fact that one cannot give a satisfactory account of himself to the pleasure of the inquiring officer make him guilty of an unspecified crime? Such unbridled discretion cannot be constitutionally vested in the policeman or the court." See also Alegata v. Commonwealth, Mass., 231 N.E.2d 201, 205 (1967). But see City of Portland v. Goodwin, 187 Or. 409, 210 P.2d 577 (1947).

53. *Supra* note 25.

54. 382 U.S. at 90, 86 S.Ct. at 213, quoting Cox v. Louisiana, *supra* note 25, 379 U.S. at 579, 85 S.Ct. 453.

—*"Leading An Immoral Or Profligate Life"*

■ The second statutory provision appellant allegedly violated denominates a vagrant "[a]ny person [1] leading an immoral or profligate life [2] who has no lawful employment and who has no lawful means of support realized from a lawful occupation or source." [55] Our concern here is with the first specification.[56] Immorality and profligateness are not terms of art, at least in common understanding, and the definitional problems they pose are quite readily apparent.

The record in this case contains an instance in point. A police officer testified that he made approximately 470 arrests for vagrancy in 1965, yet he was uncertain as to the reach of the statutory words. He was sure that "leading an immoral and profligate life means being a known prostitute." When questioned, however, as to whether the statutory language is limited to prostitution, this veteran responded "No, I imagine it means other things," but commendably admitted that "I don't know what they might mean."

Turning to prior judicial construction, we discover that the dilemma is not lessened but magnified. The District of Columbia Court of Appeals considers the provision under examination to be so elastic as to prohibit any conduct that is not "decent, upright, good, [or] right." [57] Elaborating, it says:

"Webster's Dictionary defines 'profligate' as 'completely given up to dissipation and licentiousness; broken down in morals and decency.' It has been said that 'Immorality' is not necessarily confined to matters sexual in their nature; it may be that which is contra bonos mores; or not moral, inconsistent with rectitude, purity, or good morals; contrary to conscience or moral law; wicked; vicious; licentious, as, an immoral man or deed. Its synonyms are: Corrupt, indecent, depraved, dissolute; and its antonyms are: Decent, upright, good, right." [58]

We are in no position to debate this interpretation, for the statutory language leaves an open field for speculation. And given this meaning, subsection (3) affords an almost boundless area for individual asessment of the morality of another's behavior.

■ In Musser v. Utah,[59] the Supreme Court remanded a conviction under a state statute prohibiting conspiracies "to commit acts injurious to public morals" with a strong suggestion that the law was unconstitutionally vague. "Standing by itself," said the Court, "it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order." [60] We think the subsection before us is cut from much the same cloth. Opposing segments of the general public may agree as to the immorality or profligateness of many activities.[61] But, more importantly, it is

55. D.C.Code § 22–3302(3) (1967 ed.).

56. See note 13, *supra*, and accompanying text.

57. Davenport v. District of Columbia, 61 A.2d 486, 488 (D.C.Mun.App.1948).

58. *Id.* at 488.

59. 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562 (1948).

60. *Id.* at 97, 68 S.Ct. at 398. On remand, this phrase was declared void for vagueness. State v. Musser, 118 Utah 537, 223 P.2d 193 (1950). Compare State v. Vallery, 212 La. 1095, 34 So.2d 329

(1948); State v. Truby, 211 La. 178, 29 So.2d 758 (1947). See also Hicks v. District of Columbia, 383 U.S. 252, 253–261, 86 S.Ct. 798, 15 L.Ed.2d 744 (1966) (dissenting opinion of Mr. Justice Douglas).

61. We do not, of course, imply that prostitution is a subject on which opinion is apt to be divided, but this is beside the point. Constitutional specificity must be found in the statute defining the offense, and the particular conduct involved, though constitutionally punishable, does not save the statute. See Ricks v. United States, *supra* note 4, 134 U.S.App. D.C. at —, —, 414 F.2d at 1116–1117.

expectable, if indeed not inevitable, that they will disagree on many others without approaching absurdity. Not only does the phrase under scrutiny fail to chart for the individual citizen the course that is proscribed, but it also fails to mark out reasonably distinct boundaries for the judges, juries and police officers who are required to administer the law. We hold that the first element of subsection (3)—"leading an immoral and profligate life"—necessitates so much guesswork as to its coverage as to incur the condemnation of the Fifth Amendment.

### D.C.Code § 22–3302(8)

■ Subsection (8), the final provision invoked against appellant, extends the vagrancy definition to "[a]ny person [1] who wanders about the streets at late or unusual hours of the night [2] without any visable or lawful business and [3] not giving a good account of himself." [62] The last component—failure to render "a good account"—alone suffices to invalidate this subsection on vagueness grounds.[63] Upon analysis, we find that the first two elements of subsection (8) afflict it with the same malady.

—*"Wanders * * * Without Any Visible Or Lawful Business"*

■ The proscription against wandering has no built-in criterion whatever for ascertainment of the kind or degree of movement prohibited. Nor does the statute attempt to give content to the expression "without any visible or lawful business." As construed by the District of Columbia Court of Appeals, this phrase "does not refer to the ordinary

vocation of the person but has reference to the purpose of being on the street, and business is not limited to the pursuit of monetary gain. One may have lawful business on the street even though he is there merely for exercise or recreation or any other proper purpose." [64]

■ This appears to be a logical reading of the statutory language, but what it means is that law enforcement officers may arrest a person who "wanders" on the streets late at night without "any proper purpose." [65] A police officer must first make an unguided determination as to whether in one's activity on the streets he "wanders." Coupled with the requirement that the wanderer give "a good account" of himself, it is evident that the officer must then make an equally unassisted judgment as to whether the purpose is "proper." Subsection (8) is thus a grant of an unfettered discretion—to administrative and judicial authorities alike—to regulate movement on the public streets. This is plainly much more than the Constitution tolerates.[66]

### III

The role of statutory vagueness in the aberrations of vagrancy administration appears vividly from the testimony regarding appellant's arrest and the enforcement policies generally in vogue in the District. One of the officers who arrested appellant testified that it "appeared" to him that she had been soliciting prostitution, but that for lack of evidence he "could not make a proper arrest or a proper prosecution on grounds of prostitution." "Instead," he arrested her for vagrancy, in accordance with what

---

62. D.C.Code § 22–3302(8) (1967 ed.) (bracketed numerals supplied).

63. Text *supra* at notes 48 to 54.

64. Beail v. District of Columbia, *supra* note 17, 82 A.2d at 767–768.

65. "I have known judges and lawyers who, afflicted with insomnia, have wandered the streets at night." Douglas, Vagrancy And Arrest On Suspicion, 70 Yale L.J. 1, 4 (1960). See also Fenster v. Leary, 20 N.Y.2d 309, 282 N.Y.S.2d 739, 229 N.E.2d 426, 428 (1967).

66. Text *supra* at notes 18 to 30.

seems to be common practice.[67] The other officer participating in the arrest opined that appellant is leading an immoral and profligate life because "I believe she is currently soliciting prostitution," but, since "all the elements of soliciting prostitution were not there," admitted that he "could not prove it." This officer, too, in taking appellant into custody, was simply following his usual procedure in such situations.[68]

Definitions of crime traditionally combine a wrongful intent with a guilty act in a causal relationship to a consummated social harm. None of these characteristics is to be found in vagrancy prosecutions, which present instead "the astounding spectacle" of "criminality with no misbehavior at all." [69] Into the making of "vagrancy" go such formless ingredients as "loitering," "wandering," "leading an immoral and profligate life," and "good account," concepts featuring a suspicion that a crime is being or might be committed.[70] Essentially all that has to be proved beyond a reasonable doubt in a vagrancy prosecution is that the accused was observed under circumstances deemed questionable. Charges of vagrancy thus make possible criminal convictions based on conjecture rather than on evidence of criminality,[71] contrary to the most fundamental principles of our criminal jurisprudence.

The record exposes vagrancy enforcement as a device utilized not only to in-

67. "Q. So that in practical effect vagrancy is used as a charge or ground for arrest in cases where you feel that there is prostitution or sodomy going on but you cannot make a case?
"A. That's correct. It is used to get undesirables off the street.
"Q. What is an undesirable?
"A. It is a prostitute—In my estimation, it is a prostitute, a junkie, a thief, a pervert, and what have you. The rest. Pervert, prostitute, junkie, thief.
"Q. These are people who have committed these acts in the past?
"A. Yes, and are still out there doing the same thing.
"Q. Well, if they are still out there committing thievery or prostitution or whatever, if you could make a case against them you would arrest them on that ground, I suppose?
"A. Yes.
"Q. So that we are back again to the problem of your using the vagrancy statute to justify an arrest of someone against whom you cannot make a case on some other ground that you really would prefer to arrest on; is that right?
"A. That's correct."

68. "Q. Is there any reason for arresting someone as a vagrant when you know he has committed some other crime? * * * For example, you know that somebody is immoral and profligate because she is soliciting prostitution or she is buying and selling dope. Is there any reason to arrest her as a vagrant rather than to arrest her for committing prostitution?

"A. That person might be a real smooth operator and I might not be able to catch them doing these other things."

69. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 102.

70. Thus, in the case at bar, "leading an immoral and profligate life," an element of the vagrancy charged, was proved by the opinions of witnesses that appellant was soliciting prostitution, a matter which itself could not be proved. Moreover, the suspicion may sometimes be even further removed, as Judge Greene found it was here: "The officers testified that defendant Ricks is leading an immoral and profligate life because they believed her to be a prostitute. This suspicion of prostitution, in turn, rests primarily upon her presence in the doorway of an establishment which the officers suspected of being a house of ill fame. But the officers candidly admitted that they had no proof that the establishment is a house of ill fame." Ricks v. District of Columbia, *supra* note 14. This quotation is from an unpublished footnote in Judge Greene's opinion filed in the record. See note 14, *supra.*

71. Vagueness in the statute, and resulting convictions on suspicion, are not ameliorated by the statutory standards defining the status elements of the vagrancy offense. Indeed, these elements of criminality—unemployment and poverty— pose additional constitutional problems. See the cases cited *supra* note 35.

flict punishment for suspected but unprovable violations in progress but also, through preventive conviction and incarceration, to suppress crime in the future. By this theory of vagrancy administration, a police officer testifed, "undesirables" [72] are swept from the streets into prison because "if they are not out there, the crime can't be committed." "[I]n practical effect," the witness acknowledged, "vagrancy is used as a charge or ground for arrest in cases where you feel there is prostitution or sodomy going on but you cannot make a case. * * It is used to get the undesirables off the street." [73] "[T]he good effect of this statute," the witness continued, "is that it puts people in jail who might be about to commit a crime or who might commit a crime in the near future," and "helps to lower the crime rate of the precinct."

According to another officer, a vagrancy arrest may be preferred to an arrest for another crime, though known to be in commission, because the arrested "person might be a real smooth operator and I might not be able to catch them doing these other things." [74] The Corporation Counsel's chief prosecutor testified that "you certainly don't have to wait until a person goes in and engages in the act of prostitution before you can see fit to arrest that person for being a vagrant."

We agree with Judge Greene that the "basic design [of the vagrancy law] is one of preventive conviction imposed upon those who because of their background and behavior are more likely than the general public to commit crimes, and that the statute contemplates such convictions even though no overt criminal act has been committed or can be proved." [75] And Mr. Justice Frankfurter's sage observation lays bare the part that statutory vagueness plays in the realization of that objective:

"[S]tatute[s] of the type that seek to control 'vagrancy' * * * are in a class by themselves, in view of the familiar abuses to which they are put. * * * Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense. In short, these 'vagrancy statutes' and laws against 'gangs' [76] are not fenced in by the text of the statute or by the subject matter so as to give notice of conduct to be avoided." [77]

We do not gainsay the importance of crime prevention or the need for effective measures to combat transgression of the criminal law. But as desirable as these goals are,[78] they can-

72. See note 67, *supra.*

73. *Id.*

74. See note 68, *supra.*

75. District of Columbia v. Ricks, *supra* note 14, 94 Wash.L.Rptr. at 1272. "A vagrant is a probable criminal; and the purpose of the statute is to prevent crimes which may likely flow from his mode of life." District of Columbia v. Hunt, 82 U.S.App.D.C. 159, 161, 163 F.2d 833, 835 (1947). See also Harris v. District of Columbia, 192 A.2d 814, 816 (D.C.App. 1963); Clark v. District of Columbia, 34 A.2d 711, 712 (D.C.Mun.App.1943).

76. Referring to Lanzetta v. New Jersey, *supra* note 20.

77. Winters v. New York, 333 U.S. 507, 540, 68 S.Ct. 665, 682, 92 L.Ed. 840 (1948) (dissenting opinion). Nothing in the majority opinion contests this declaration.

78. The President's Crime Commission has concluded, however, that society pays a "high price" for the "arbitrary behavior by the authorities" sanctioned by vagrancy laws. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts, *supra* note 69, at 103–104. Enforcement of these laws gives rise to a "sense of persecution" and "hostility to police and other authority," reactions which in turn foster "the very conditions of criminality society is seeking to extirpate." *Id.* at 104. See also President's Commission on

not be achieved through techniques that trample on constitutional rights.[79] Many years ago this court held that a citizen cannot be punished merely for being "a suspicious person." [80] Statistical likelihood that a particular societal segment will engage in criminality is not permissible as an all-out substitute for proof of individual guilt.[81] And not even past violation of the criminal law authorizes one's subjection to innately vague statutory specifications of crime.[82]

We conclude, then, that subsections (1), (3) and (8) of the general vagrancy statute must fall for unconstitutional vagueness. We accordingly reverse the judgment of the District of Columbia Court of Appeals with direction to remand the case to the District of Columbia Court of General Sessions for dismissal of the information.

It may be appropriate to add a final word on the scope and nature of our ruling. Our opinion has been cast in relatively narrow doctrinal terms and passes on only those particular statutory sections involved in the information against appellant. As we have suggested in our opinion, besides the need for adequate notice to both the public and enforcement officials of what conduct constitutes criminal activity, other constitutionally protected interests may be infringed by vagrancy statutes such as those before us. While we have not relied on these doctrines, we do not wish to suggest that they are inapplicable or of less dignity than those upon which we base our ruling.

We are also aware that our ruling, as a matter of stare decisis, undercuts the validity of other sections of both the general vagrancy statute and narcotic vagrancy legislation. Our silence as to the validity of these sections does not indicate any reservation about extending our holding to cover them in appropriate cases. We do not rule on those sections now because their validity was not argued nor is decision on them necessary for resolution of the case before us. We add this word, fully aware that it is dictum, to avoid constriction of the scope of the ruling by all concerned, including those in the legislative and executive branches.

Reversed.

Law Enforcement and Administration of Justice, Task Force Report: The Police 187 (1967). Thus the constitutional violations flowing from application of the statute before us are compounded by the statute's dysfunctional anti-societal effects.

79. Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 62 L.Ed. 149 (1917). See also Watson v. City of Memphis, 373 U.S. 526, 535, 539, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) ; Wright v. Georgia, supra note 27, 373 U.S. at 293, 83 S.Ct. 1240; Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

80. Stoutenburgh v. Frazier, 16 App.D.C. 229, 48 L.R.A. 220 (1900).

81. As Judge Greene observed, "while the particular categories singled out in the vagrancy law may well be statistically more likely to commit offenses than other population groups, they are not alone in this respect. It has been shown that juveniles, for example, specifically those between the ages 16 and 21, commit a far larger proportion of crimes than other groups in society. If the presumption inherent in the vagrancy law is valid, then it would be equally proper to provide for the punishment of all those aged between 16 and 21 who might be found loitering and are unable to give a good account of themselves. I do not believe Congress has any such power." District of Columbia v. Ricks, supra note 14, 94 Wash.L.Rptr. at 1273. See also Lanzetta v. New Jersey, supra note 20, 306 U.S. at 456, 457, 59 S.Ct. 618; United States v. Bufalino, 285 F.2d 408, 419 (2d Cir. 1960).

82. See Lanzetta v. New Jersey, supra note 20, where the New Jersey "gang" statute in terms applied only to those previously convicted, but was nonetheless declared null on vagueness grounds.