Hattie Mae RICKS and Joseph N. Williams, Appellants,

v.

UNITED STATES of America, Appellee.

No. 20919A.

United States Court of Appeals District of Columbia Circuit.

Argued May 17, 1968.

Decided Dec. 23, 1968.

Messrs. Monroe H. Freedman and Sol Rosen, Washington, D. C., with whom Mr. Ralph J. Temple, Washington, D. C., was on the brief, for appellants.

Mr. Theodore Wieseman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker and Earl J. Silbert, Asst. U. S. Attys., were on the brief, for appellee.

Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In Ricks v. District of Columbia *(Ricks I)*,[1] decided today, we hold that three subsections of the District of Columbia's "general vagrancy" law [2] are unconstitutionally vague. Before us now is a simi-

---

1. Ricks v. District of Columbia, 134 U.S. App.D.C. ——, 414 F.2d 1097, hereinafter cited *"Ricks I."*

2. D.C.Code §§ 22–3302 to 22–3306 (1967 ed.).

lar challenge[3] to the "narcotic vagrancy" act[4] in operation in the District. Like its *Ricks I* prototype, this statute sets forth alternative definitions of a "vagrant"[5]—a term here involving indispensably narcotic drug usage or past conviction of a narcotic offense[6]—and makes vagrancy under its provisions a misdemeanor.[7] And like the general vagrancy enactment,[8] the narcotic vagrancy law has been implemented administratively with police observation procedures which are pursued before vagrancy arrests are made.[9]

Both appellants were subjected to a series of pre-arrest observations, all in the 1200 block of Seventh Street, Northwest, and the testimony at trial described what was seen on each occasion. On January 6, 1966, at 11:00 p. m., appellant Williams was on the street with two women said to be convicted narcotic offenders. On January 13, at 11:30 p. m., he conversed with another female narcotic used in front of a building. Both appellants, on January 22 at 3:20 a. m., crossed Seventh Street, entered a building and remained in the hallway for 15 minutes. Needle marks were discerned on appellant Williams' arm each time, and one of these marks was said to be fresh. Each time, however, questioning by the observing officers produced an explanation for his presence in the neighborhood and a denial that he was using narcotics.

Observations on appellant Ricks[10] began on February 21, 1966, when she sat, for short periods after midnight, in a carry-out shop before twice leaving with different men and later returning alone. Two days later, at 9:30 and 9:45 p. m., she stood on the street with two women reputed to be narcotic law violators and prostitutes; within the hour, she was on the street alone, and at 11:00 p. m. she entered a bar. On February 24, between 4:00 and 4:45 a. m., she got into and out of parked cars with men behind the wheels. On March 1, at 10:50 p. m., she was on the street for ten minutes. She had old and new needle marks on her arm, so the testimony ran, but on all but one occasion she denied the use of narcotics. And each time she gave explanations for her presence on Seventh Street, but once admitted to two acts of prostitution.

The arrests occurred on March 8, 1966, about 10:15 p. m. As officers watched from across the street, appellants stood in the 1200 block of Seventh Street, Northwest, in the company of "a known and admitted" gambler and two "known

---

3. Appellants also urge other grounds of unconstitutionality but, in our view of the case, it is unnecessary to consider them.

4. D.C.Code § 33–416a (1967 ed.).

5. D.C.Code § 33–416a(b) (1) (1967 ed.). And see text *infra* at notes 14 and 15.

6. D.C.Code § 33–416a(b) (1) (1967 ed.). And see text *infra* at notes 14 and 15, and note 14, *infra*.

7. D.C.Code § 33–416a(g) (1967 ed.). It is further provided that "[t]he court, in sentencing any person found guilty under the provisions of this section, may in its own discretion or upon the recommendation of the probation officer, impose conditions upon the service of any such sentence. Conditions thus imposed by the court may include submission to medical and mental examination, and treatment by proper public health and

welfare authorities; confinement at such place as may be designated by the Commissioners of the District of Columbia, and such other terms and conditions as the court may deem best for the protection of the community and the punishment, control, and rehabilitation of the defendant." D.C.Code § 33–416a(h) (1967 ed.).

8. *Ricks I, supra* note 1, 134 U.S.App.D.C. at ——, 414 F.2d at 1098.

9. Narcotic vagrancy observations involve periodic police surveillance and questioning of a suspected narcotic vagrant, and are mechanically similar to the general vagrancy observations described in *Ricks I, supra* note 1, at 1099. Two observations normally precede a narcotic vagrancy arrest, the suspect becoming subject to arrest upon the third observation.

10. Also the appellant in *Ricks I, supra* note 1.

and convicted" narcotic violators and prostitutes. Appellant Williams was then engaged in an argument with one of the women who claimed that he had "sold me some bad stuff." [11] The accuser called the officers over and repeated the accusation, which was promptly denied.[12] Examination revealed "fresh marks" on both appellants' arms and, after questioning,[13] each was placed under arrest.

Appellants were prosecuted on separate informations charging vagrancy within two of the statute's specifications:

"(b) For the purpose of this section—

"(1) the term 'vagrant' shall mean any person who is a narcotic drug user [14] or who has been convicted of a narcotic offense in the District of Columbia or elsewhere and who—

"(A) having no lawful employment or visible means of support realized from a lawful occupation or source, is found mingling with others in public or loitering in any park or other public place and fails to give a good account of himself; * * *

"(C) wanders about in public places at late or unusual hours of the night, either alone or in the company of or association with a narcotic drug user or convicted narcotic law violator, and fails to give a good account of himself;" [15]

At a joint trial in the Court of General Sessions, appellants moved to dismiss the informations for alleged unconstitutional vagueness in the statutory proscriptions. Chief Judge Greene, noting the similarity of the general and the narcotic vagrancy statutes, and relying upon his opinion in *Ricks I*,[16] was of the opinion that the latter was unconstitutional. Considering, very properly, that he was bound by decisions of the District of Columbia Court of Appeals to the contrary,[17] he denied the motions, found each appellant guilty, and sentenced each to a term in jail. The Court of Appeals affirmed,[18] and the importance of the constitutional issues raised led to allowance of this further appeal. Without reaching other contentions advanced by appellants, we hold that the statutory provisions upon which they were convicted in this case are vague to the point that they contravene the Fifth Amendment, and accordingly reverse.

## I

We are greeted at the outset with the Government's protest that appellants lack standing to urge the unconstitutionality of the narcotic vagrancy statute on its face. The Government expresses concern that appellants will be permitted to "attack the statute on the ground that its language might permit it to be applied in

---

11. In the context of the record, the reference was to an alleged sale of narcotic drugs.

12. Appellant Williams repeated this denial at trial.

13. Appellant Williams responded to many of the questions. Appellant Ricks refused to answer any at all.

14. "[T]he term 'narcotic drug user' shall mean any person who takes or otherwise uses narcotic drugs, except a person using such narcotic drug as a result of sickness or accident or injury, and to whom such narcotic drugs are being furnished, prescribed, or administered in good faith by a duly licensed physician in the course of his professional practice." D.C.Code § 33–416a(b) (2) (1967 ed.).

15. D.C.Code § 33–416a(b) (1) (A), (C) (1967 ed.).

16. District of Columbia v. Ricks, 94 Wash. L.Rptr. 1269 (1966).

17. See Wilson v. United States, 212 A.2d 805 (D.C.App.1965), *rev'd on other grounds* 125 U.S.App.D.C. 87, 366 F.2d 666 (1966); Rucker v. United States, 212 A.2d 766 (D.C.App.1965); Brooke v. United States, 208 A.2d 726, 728 (D.C.App.1965); Harris v. United States, 162 A.2d 503, 505 (D.C.Mun.App.1960); Jenkins v. United States, 146 A.2d 444, 447 (D.C.Mun.App.1958).

18. Ricks v. United States, 228 A.2d 316 (D.C.App.1967).

an unconstitutional manner to other people in hypothetical situations not involved in the instant case." We think it clear, however, that the Government has misconceived appellants' point of view. For this reason, we deem it helpful to mark out the contours of this litigation, to identify what is involved, and to shape the issue we are summoned to decide.

Appellants contend that they have been arrested and convicted for violation of two statutory subsections framed in language too imprecise to fairly warn them of the conduct sought to be prohibited.[19] Appellants also say that the ambiguities in these two subsections left police officers free to charge, and judicial officers free to assess, their guilt solely on the basis of conjecture.[20] Appellants' complaint is addressed to the two subsections upon which their convictions were rested,[21] and to the impact of those subsections upon them alone.[22] Their position is not camouflaged by makeweight hypotheticals in an effort to induce us to "consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation,"[23] nor do they call upon us "to anticipate a question of constitutional law in advance of the necessity of deciding it."[24] Appellants, in endeavoring to demonstrate their thesis of unconstitutional personal harm, are at liberty to resort to the linguistic sources of their present legal difficulties.[25]

## II

Proceeding now to the merits, and examining the two subsections of the narcotic vagrancy law under which appellants were convicted, we see the substantial similarity of the statutory proscriptions which were applied against appellants in this case and those which in *Ricks I* we held to be constitutionally insufficient.

Subsection (A), upon which the first charge against appellants was laid, defines as a vagrant any unemployed narcotic user or convicted narcotic offender[26] without lawful and "visible means of support" who "is found mingling with others in public or loitering in any * * * public place and fails to give a good account of himself." [27] The striking resemblance of this subsection to the invalid *Ricks I* subsection (1)[28] is apparent.

Subsection (C), the statutory predicate for the second accusation against appellants, extends the vagrant definition to any narcotic user or convicted narcotic offender [29] who "wanders about in public places at late or unusual hours of the night * * * and fails to give a good

19. See discussion in text *infra* pt. II.

20. See discussion in text *infra* pt. II.

21. And we, of course, do not consider the validity of any other parts of the statute.

22. Thus we deem inapposite the proposition, relied on by the Government, that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).

23. Barrows v. Jackson, 346 U.S. 249, 256, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953). See also United States v. Raines, *supra* note 22, 362 U.S. at 21, 80 S.Ct. 519.

24. United States v. Raines, *supra* note 22, 362 U.S. at 21, 80 S.Ct. at 522.

25. We distinguish this point from the facet of the Government's argument discussed in the text *infra* at notes 10–15.

26. See note 14, *supra*. Both appellants had previously been convicted of offenses against the narcotic laws.

27. D.C.Code § 33–416a(b) (A) (1967 ed.).

28. *Ricks I*, *supra* note 1, 134 U.S.App.D.C. at ——, ——, 414 F.2d at 1101. 1102.

29. See note 14, *supra*.

account of himself." [30] The close likeness this subsection bears to the infirm *Ricks I* subsection (8)[31] is manifest.

The same fatal statutory generalities discussed in *Ricks I*—"loitering," [32] failure to give "a good account," [33] "wanders," [34] and without "visible means of support" [35]—pervade the enactment under scrutiny,[36] without any legislative definition whatever. Both of the subsections involved in this appeal incorporate at least two of them as essential elements of the crimes of which appellants were found guilty. As was the situation in *Ricks I*, there is no body of limiting judicial construction helpful to the problems presented here.[37]

 Thus we cannot find in the statutory language a degree of specificity that would enable citizens of ordinary intellect to distinguish wrong from right, or administrators or jurists to confidently make applications. And like the provisions involved in *Ricks I*, those here in issue open the door wide to convictions on suspicion in lieu of proof of criminality. A vagrancy conviction is precipitated by the police record accumulated from vagrancy observations, and the observations enable the building of that record on suspicion alone. The process is well illustrated by the testimony of the officer who made the first observation of appellant Ricks. She was selected for a vagrancy observation "[b]ecause in my opinion she was involved in some sort of an illegal activity" which the witness suspected was prostitution. "[T]he basis for that suspicion" was that "she's a known prostitute" and because the officer twice saw her leave the carry-out with different men and return shortly thereafter. Admittedly these circumstances created no ground for a prostitution arrest, but they "did justify * * * making an observation on her as a vagrant." So, as the officer further admitted, "the reason that she was singled out from among the other people on the street derives from the fact that [the officer] had suspicions of her regarding illegal conduct that [he] did not have regarding other people on the street."

Although appellants were arrested for and convicted of narcotic vagrancy, the Government conceded at trial that at no time were they found in the possession of narcotic drugs. While needle marks were seen on their arms when inspected at the observations, the evidence would not sustain the conclusion that they connoted present, as distinguished from possibly recent, narcotic use. The testimony discloses, too, that if the observing officers had had reasonable cause to believe that appellants were then in violation of the narcotic laws, they would have been arrested for such violations rather than made the subjects of vagrancy observations. More broadly, if there had been

---

30. D.C.Code § 33–416a(b) (C) (1967 ed.).

31. *Ricks I, supra* note 1, 134 U.S.App. D.C. at —— ——, 414 F.2d at 1107.

32. *Ricks I, supra* note 1, 134 U.S.App. D.C. at —— — ——, 414 F.2d at 1102–1104.

33. *Ricks I, supra* note 1, 134 U.S.App. D.C. at —— — ——, 414 F.2d at 1104–1105.

34. *Ricks I, supra* note 1, 134 U.S.App. D.C. at —— ——, 414 F.2d at 1107.

35. *Ricks I, supra* note 1, 134 U.S.App. D.C. at —— — ——, 414 F.2d at 1107.

36. Similarly "mingling with others," even as applied to convicted offenders, is an expression imprecise in content. Compare Lanzetta v. New Jersey, 306 U.S. 451, 456–458, 59 S.Ct. 618, 83 L.Ed. 888 (1939). See also Baker v. United States, 228 A.2d 323 (D.C.App.1967).

37. See Lyons v. United States, 221 A.2d 711, 712 (D.C.App.1966) (prior knowledge that accused is narcotic user or convicted narcotic offender is prerequisite to narcotic vagrancy arrest); Jenkins v. United States, supra note 17, 146 A.2d at 446 (statute applies even though defendant did not know his associates were drug users and convicted narcotic offenders).

grounds for arrest for any kind of criminal conduct, the arrest would have superceded the observation. Thus, as one officer put it, when you "suspect" a person "of some form of crime," a narcotic vagrancy observation is "sort of something you do instead of making an arrest."

A basic suspicion underlying narcotic vagrancy enforcement, the testimony further disclosed, is that "sometimes" when addicts are on the streets they "may" be plotting crime. This was vividly confirmed by the prosecutor in colloquy with the judge at trial:

"THE COURT: * * * What are these people doing in your view when they are loitering or mingling and failing to give a good account of themselves? * * * What are they doing that is harmful to the public? What is the statute addressed to?

"[THE PROSECUTOR]: They are * * * in a position where from their way of life there is a real danger that they will commit some other crime, not this particular crime [narcotics vagrancy], but some other crime.

"THE COURT: So, we suspect that because of what they are doing here, they might well engage in criminal conduct? Is that what it comes down to?

"[THE PROSECUTOR]: That is correct.

"THE COURT: And you think that under our system you can have a statute which essentially proceeds on the principle that because the police officer or prosecutor or a court suspects that because of presence or activity or whatever, a person may commit an offense, that that in itself may be made a crime?

"[THE PROSECUTOR]: Absolutely."

As *Ricks I* forecasts, we do not agree with the prosecutor.[38] And it is evident from our exposition in *Ricks I* that, unless somehow otherwise saved, we must hold that both of the subsections underpinning appellants' convictions fall short of the constitutional dictate that criminal conduct be defined with reasonable certainty.[39]

### III

The Government would find the antidote for the ills plaguing the narcotic vagrancy statute in the mode of its accustomed administration. By passing the statutory language in favor of its particular application to appellants, the Government endeavors to construct a more palatable decisional context for the vagueness problem. Appellants were narcotic users, it points out, who loitered nightly with other narcotic users in a block where narcotic traffic was dense. It is only in a "pocket of narcotic activity," it asserts, that police officers invoke the statute. These pockets are said to be the points at which addicts congregate while awaiting a "connection"—a contact with a peddler of narcotic drugs; these circumstances of "sinister significance," it is claimed, warrant vagrancy observations and justify a "good account" on pain of ultimate arrest. An enforcement policy so limited as to area, subjects and purposes, the Government urges, brings the statute in line with the Constitution.

We cannot accept this argument. To begin with, the record does not adequately sustain the Government's factual premises. Narcotic vagrancy enforcement, the record shows, is stepped up in four precincts in the District of Columbia where the police consider the incidence of vice to be particularly high.[40] Offi-

38. *Ricks I, supra* note 1, 134 U.S.App. D.C. at —— ——, 414 F.2d at 1103–1104.

39. *Ricks I, supra* note 1, 134 U.S.App. D.C. at —— ——, 414 F.2d at 1100–1102.

40. This is based on a belief that these precincts embrace areas prone to illegality, but yet a belief not based on facts rising to the dignity of probable cause. Suspect establishments thus continue to

cers specializing in the suppression of drug traffic bear down in these sections of the city.[41] The testimony describing the 1200 block of Seventh Street, Northwest, made out plainly enough its unwholesome characteristics,[42] but hardly the "pocket of narcotic activity" the Government tries to picture.

While suspected narcotic users frequented the block, the record is bare of evidence that sales of narcotic drugs occurred there. While reputed narcotic users and prostitutes were familiar characters in the testimony recounting the observations in this case, the dealer in narcotics was totally absent. The observations themselves—particularly those on appellant Ricks, which smack of surveillance for prostitution—are devoid of the "sinister significance" of trafficking in drugs. While the 1200 block may have been one of the police department's favorite targets, there is nothing to suggest that it was driven home to the citizenry that conduct unmolested in the city generally[43] would become criminal in that

block by reason of concentrated narcotic vagrancy enforcement there.

Moreover, error in the Government's legal thesis mounts with the Government's increase in overstatement of pertinent doctrine. We are not at liberty to ignore the shortcomings of the statutory language, or rationalize its validity, simply on the basis of the methods associated with its administration. "[A] statute attacked as vague must initially be examined 'on its face,' "[44] and many times the inquiry need extend but little further.[45] The *sine qua non* of constitutional certainty in the definition of crime is fair warning of the statutory prohibitions to those of ordinary intelligence—notice of the proscribed activities which is reasonable when gauged by common understanding and experience.[46] But "it does not follow that a readily discernible dividing line can always be drawn, with statutes falling neatly into one of the two categories of 'valid' or 'invalid' solely on the basis of such an examination,"[47] so

operate, but residents of these neighborhoods who are thought to be frequenting them are observed, arrested and convicted for vagrancy.

41. We have frequently noted that the police constantly receive complaints of narcotic activity in certain areas of the city. See. Dorsey v. United States, 125 U.S.App.D.C. 355, 356, 372 F.2d 928, 929 (1967) ; Hutcherson v. United States, 120 U.S.App.D.C. 274, 281, 345 F.2d 964, 971, cert. denied 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965); Freeman v. United States, 116 U.S.App.D.C. 213, 214, 215, 322 F.2d 426, 427, 428 (1963).

42. At the time of appellants' arrests, the 1200 block of Seventh Street, Northwest, was lined by two-story buildings with stores on the street floors and rooming houses on the upper floors. In the testimony, the block was described as "an area frequented by known and convicted con artists, [and] known and convicted narcotic violators," and the rooms as "dens of vice" for "the prostitutes and the junkies and the con artists, to perform their trades."

43. By reason of general non-enforcement of the narcotic vagrancy statute.

44. United States v. National Dairy Products Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963).

45. See, *e.g.*, Giaccio v. Pennsylvania, 382 U.S. 399, 403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966) ; Wright v. Georgia, 373 U.S. 284, 293, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963) ; Lanzetta v. New Jersey, supra note 36, 306 U.S. at 453–458, 59 S.Ct. 618; Cline v. Frink Dairy Co., 274 U.S. 445, 453–457, 47 S.Ct. 681, 71 L.Ed. 1146 (1927) ; Connally v. General Const. Co., 269 U.S. 385, 393–395, 46 S.Ct. 126, 70 L.Ed. 322 (1962); United States v. L. Cohen Grocery Co., 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

46. *Ricks I, supra* note 1, 134 U.S.App. D.C. at ——, ——, 414 F.2d at 1100, 1101.

47. United States v. National Dairy Products Corp., *supra* note 44, 372 U.S. at 32, 83 S.Ct. at 597.

that "[i]n determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged."[48]

Thus a statute making unlawful sales at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor" may adequately admonish that sales made below cost with that intent fall under the ban.[49] Similarly, a statutory prohibition on demonstrations "near" a courthouse, despite its ambiguity in other contexts, may convey an exhortation against "a demonstration within the sight and hearing of those in the courthouse."[50] In these illustrative situations, criminal statutes that might have been plainer were applied to the infringing conduct of those who should have known better, and were left none the worse off by the lack of further elucidation. But "[t]his is not to say that a bead-sight indictment can correct a blunderbuss statute, for the latter itself must be sufficiently focused to forewarn of both its reach and coverage."[51]

■ We have before us a blunderbuss statute without a bead-sight enforcement policy. Since nothing in the police department's administrative practices gave the advance warnings which the statute omitted, those practices could not in any event supply the constitutional deficiencies. Moreover, the statute before us does not afford reasonable warning as to the activities it undertakes to make criminal. In Lanzetta v. New Jersey,[52] the Supreme Court held that an unconstitutionally vague statute could not be saved by definition in the indictment "[i]f on its face the challenged provision is repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it,"[53] for "[i]t is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression."[54] For similar reasons, the narcotic vagrancy statute, so indistinct from overbreadth, cannot be cut down to constitutional size by the unpublicized scope limitations which its enforcement plan espouses.[55]

48. *Id.* at 33, 83 S.Ct. at 598.

49. *Id.* at 34, 83 S.Ct. at 599.

50. Cox v. Louisiana, 379 U.S. 559, 568–569, 85 S.Ct. 476, 483, 13 L.Ed.2d 487 (1965).

51. United States v. National Dairy Products Corp., *supra* note 44, 372 U.S. at 33, 83 S.Ct. at 598.

52. *Supra* note 36.

53. *Id.* 306 U.S. at 453, 59 S.Ct. at 619.

54. *Id.*

55. Compare United States v. Five Gambling Devices, etc., 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953), involving a statute prohibiting transportation of "any gambling device" in interstate commerce, and requiring "every * * * dealer" in such devices to register with the Attorney General "the addresses of his places of business in such district" and to report to the Attorney General all sales and deliveries of gambling devices "for the place or places of business in the district." Indictments against two dealers, and a libel to forfeit five gambling machines, for violation of the registration and reporting requirements failed to allege that any gambling devices had moved in interstate commerce. Judgments dismissing the indictments and libel were affirmed. Three justices joined in an opinion expressing the view that the statute, as a matter of construction, did not sustain the indictments and libel. *Id.* at 442–452, 74 S.Ct. 190. Justices Black and Douglas, in a concurring opinion, delineated the position that the registration and reporting requirements were unconstitutionally vague. "[T]he use of the phrase 'such district' is bound to leave a dealer bewildered. Does the phrase refer to the place where a dealer is compelled to file his papers? Or does it simply force him to tell in what 'district' he maintains 'places'? If a dealer is able to solve this puzzle, how is he to find 'such district'? The Act gives no hint as to where the 'district' is or how a person can locate it. It never de-

The flow and use of narcotic drugs in the Nation's Capital presents a critical social problem of monumental dimensions, and the need for effective legislative curbs is great. But as we pointed out in *Ricks I*, even desirable goals "cannot be achieved through techniques that trample on constitutional rights."[56] In disposing of this appeal, we do not enter the debate as to whether the narcotic vagrancy statute fulfils its intended mission.[57] What is clear to us, and what we hold, is that the subsections impugned in this case cannot contribute to that end consistently with the Constitution.

We reverse the judgment of the District of Columbia Court of Appeals with direction to remand the case to the District of Columbia Court of General Sessions for dismissal of the informations.

Reversed.

scribes any 'district.'" *Id.* at 453, 74 S.Ct. at 196.

We focus on the concurring opinion primarily for what it says with respect to an administrative effort to rectify the statutory ambiguities. The Attorney General promulgated a regulation which clarified the matter, but the two concurring justices deemed it inefficacious for that purpose. "Nor can a criminal statute too vague to be constitutionally valid be saved by additions made to it by the Attorney General. Of course, Congress could have prescribed that reports should be made at reasonably accessible places designated by the Attorney General. * * * But the Act under consideration did not do this." *Id.* at 453, 74 S.Ct. at 197. Moreover, the statute upon which the Attorney General drew for authority to issue the clarifying regulation did not "support the Attorney General's attempt to infuse life into an Act of Congress unenforceable for vagueness. The vital omission in this criminal statute can be supplied by the legislative branch of government, not by the Attorney General." *Id.* at 453–454, 74 S.Ct. at 197.

56. *Ricks I*, *supra* note 1, 134 U.S.App. D.C. at —, 414 F.2d at 1109. Compare Lanzetta v. New Jersey, *supra* note 36, 306 U.S. at 453–458, 59 S.Ct. 618 (stat-

ute banning gangsterism held void for vagueness); Bolin v. State, 266 Ala. 256, 96 So.2d 582, 583–586 (1957) (statute denouncing possession of ingredients for making tear gas bombs held void for vagueness); Harrell v. Texas, 166 Tex. Cr.R. 384, 314 S.W.2d 590, 592 (1958) (statute prohibiting possession and delivery of narcotics held void for vagueness).

57. "Aside from its legal vulnerability, the law appears to have minimal law enforcement value, no treatment orientation and a potential for harassment of addicts dependent on their status alone. Construed literally, the statute might forbid gatherings of narcotic addicts for self-help in group therapy or Narcotics Anonymous meetings. Although it allows medical or psychiatric treatment as sentencing alternatives, these devices have not in fact been used to secure help for the addict. We believe that any preventive aspects of the law would be better achieved through a comprehensive drug treatment program and a more rational application of the District's civil commitment law to compel known addicts to submit to treatment in appropriate cases. The Commission therefore recommends repeal of the Narcotics Vagrancy Act." Report of the President's Comm'n on Crime in the District of Columbia 580 (1966).