John HOLLY, Appellant,

v.

UNITED STATES of America, Appellee.

Michael C. McCLOUGH, Appellant,

v.

UNITED STATES of America, Appellee.

Calvin JONES, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 24142, 24144, 24145 and 71–1024.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 18, 1972.

Decided June 9, 1972.

Tamm, Circuit Judge, concurred and filed opinion.

Mr. Peter R. Kolker, Washington, D. C., with whom Miss Marilyn Cohen,

Washington, D. C., and Mr. Sanford Z. Berman, Riverdale, Md., were on the brief, for appellants in Nos. 24142, 24144, and 24145. Mr. Sol Rosen, Washington, D. C., entered an appearance for appellant in No. 24142. Miss Susan M. Chalker, Washington, D. C., entered an appearance for appellant in Nos. 24144 and 24145.

Mr. Carl W. Berueffy, Washington, D. C. (appointed by this court), for appellant in No. 71–1024.

Mr. Daniel E. Toomey, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Gregory C. Brady, Asst. U. S. Attys., were on the brief for appellees in Nos. 24142, 24144, and 24145.

Mr. C. Madison Brewer, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Warren E. King, Asst. U. S. Attys., were on the brief, for appellee in No. 71–1024.

Mr. Joel E. Hoffman, with whom Mr. Ralph J. Temple, Washington, D. C., was on the brief, for American Civil Liberties Union Fund as amicus curiae in Nos. 24142, 24144, and 24145.

Before BAZELON, Chief Judge, and McGOWAN and TAMM, Circuit Judges.

PER CURIAM:

■ The constitutionality of 22 D.C. Code § 1515(a) (1967) is challenged on these appeals by persons convicted thereunder.[1] That statute provides in pertinent part as follows:

> Whoever is found in . . . an establishment where . . . any narcotic drug is sold, administered, or dispensed without a license shall, if he knew it was such an establishment and if he is unable to give a good account of his presence in the establishment, be imprisoned. . . .

---

1. Although appellants Holly and McClough were also charged under 33 D.C.Code § 416(2) (1967), both appellants have con-ceded in their reply brief that the issue as to that statute is moot.

We now hold, on the basis of our prior decision in Ricks v. District of Columbia, 134 U.S.App.D.C. 201, 414 F.2d 1097 (Ricks I) and Ricks v. United States, 134 U.S.App.D.C. 215, 414 F.2d 1111 (1968) (Ricks II), that § 1515(a), which makes criminal liability turn upon a defendant's ability to give a "good account" of himself, is unconstitutionally vague.

It is unnecessary here to retrace the thorough analysis of Judge Robinson in *Ricks* I, which found the concept of "good account" to be "much too loose to satisfy constitutional requirements." 134 U.S.App.D.C. at 208, 414 F.2d at 1104. *See generally* 134 U.S.App.D.C. at 204–209, 211–214, 218–223, 414 F.2d 1100–1105, 1107–1110, 1114–1119. Although formulated in the context of a separate but related statute, the analysis applies equally here.[2] In the light of this conclusion, it is also unnecessary to reach appellants' additional claims that the statute is overbroad, and that it infringes First Amendment rights of association and the Fifth Amendment privilege against self-incrimination.

In United States v. McClough, note 2 *supra*, the DCCA thought to make § 1515(a) constitutionally invulnerable by construing "good account" as providing an affirmative defense rather than as constituting an element of the offense. However, we are unable to perceive how this transformation, which merely shifts the burden of proof from the Government to the criminal defendant, in any way makes the statutory offense more precise. Whatever constitutional significance such a construction may have with respect to a defendant's claim of privilege against self-incrimination, the constitutional requirement that statutes be written with sufficient precision that men do not have to "guess at their meaning" is unrelated to the technicalities of burden of proof. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). While a construction that would have narrowed "good account" to require proof merely that the defendant was not trespassing or had no intent to participate in the illegal narcotics activity might conceivably have rendered the

---

2. This was the conclusion reached by the Superior Court, in the case of appellant McClough, in granting a pretrial motion to dismiss the criminal charge. On appeal the DCCA reversed. United States v. McClough, 263 A.2d 48 (1970).

Ricks I and II involved, respectively, the District of Columbia "general vagrancy" and "narcotics vagrancy" laws, which punished those defined by the statute as "vagrants." The "general vagrancy" statute, 22 D.C.Code §§ 3302–3306 (1969), defined as a vagrant

(1) Any person known to be a pickpocket, thief, burglar, confidence operator, or felon, either by his own confession or by his having been convicted in the District of Columbia or elsewhere of any one of such offenses or of any felony, . . . and having no lawful means of support realized from a lawful occupation or source, *and not giving a good account of himself* when found loitering around in any park, highway, public building, or other public place, store, shop, or reservation, or at any public gathering or assembly. * * * (emphasis added)

(8) Any person who wanders about the streets at late or unusual hours of the night without any visible or lawful business *and not giving a good account of himself.* (emphasis added)

The "narcotics vagrancy" statute, 33 D.C. Code § 416a, provided that

(b) For the purpose of this section—

(1) the term 'vagrant' shall mean any person who is a narcotic drug user or who has been convicted of a narcotic offense in the District of Columbia or elsewhere and who—

(A) having no lawful employment or visible means of support realized from a lawful occupation or source, is found mingling with others in public or loitering in any park or other public place *and fails to give a good account of himself*; * * * (emphasis added)

In invalidating these statutes, Judge Robinson went on to observe

"We are also aware that our ruling, as a matter of *stare decisis*, undercuts the validity of other sections of both the general vagrancy statute and narcotic vagrancy legislation. Our silence as to the validity of these sections does not indicate any reservation about extending our holding to cover them in appropriate cases." 134 U.S.App.D.C. at 214, 414 F.2d at 1110.

statute sufficiently precise, the DCCA has expressly rejected these alternatives. Wells v. United States, 281 A.2d 226 (1971).[3]

█ The Government has made no real effort to justify the manifest infirmities of the phrase "good account," but rather urges this court, despite our conceded jurisdiction to resolve these appeals on their merits, to defer to the decisions of the DCCA upholding the statute. If the DCCA had not yet had the opportunity to rule on the issues here, or if the question involved only the construction of a statute unrelated to constitutional considerations, sound policy might support this request. Here, however, the position of that court on the constitutional question is clear. Appellants Holly and Jones have been convicted under the statute, and appellant McClough faces trial under it. Thus we are not persuaded to reject their appeals in the teeth of our own views as to the merits of their constitutional claim—views which were shaped and made known as long ago as 1968 in *Ricks*.

The judgments appealed from are reversed, and the cases are remanded for disposition consistent herewith.

It is so ordered.

TAMM, Circuit Judge (concurring):

I join in the court's opinion today solely because these cases fall squarely within our decisions in Ricks v. District of Columbia, 134 U.S.App.D.C. 201, 414 F.2d 1097 (1968); Ricks v. United States, 134 U.S.App.D.C. 215, 414 F.2d 1111 (1968). Were it not for the constitutional issue involved I would have preferred to have this court stay its hand in these cases in deference to the District of Columbia Court of Appeals. It is because of these constitutional issues alone that I join in the court's decision.

The need for reorganization of the courts in the District of Columbia was a foregone conclusion by the time that the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (July 29, 1970), took effect on February 1, 1971. In March 1970 the House District Committee observed,

[t]he fact is that the diversity of Federal and local interest [in the District of Columbia] has led to the jurisdictional disarray which presently exists—the local court handles some federal misdemeanors, the Federal court has jurisdiction of local felonies and concurrent jurisdiction over local misdemeanors; the local court makes determinations as to certain administrative procedures appeals, the Federal court hears others without apparent distinction as to local-Federal interest; the Federal court tries cases that would elsewhere be within the state system. And then there is the overall problem of concurrent jurisdiction, producing delays in the disposition of criminal matters, described as "ping-pong", in derogation of the public and federal interest.

H.R.Rep.No.907, 91st Cong., 2d Sess. 33 (1970). As a result of feelings of inefficiency, confusion, and lack of effectiveness of the local courts Congress enacted the Court Reform Act. Under the terms of one section of that Act, 11 D. C.Code § 102 (Supp. V 1972), "The D. C. Court of Appeals is declared by Congress to be the 'highest court of the District of Columbia' whose final judgments and decrees are reviewable by the Supreme Court of the United States [pursuant to 28 U.S.C. § 1257 (1970)] in the same manner as such review is accorded the highest court of a State." Kern, The District of Columbia Court Reorganization Act of 1970: A Dose of the Conventional Wisdom and a Dash of Innovation, 20 Am.U.L.Rev. 237, 241 (1970–71).

---

3. We deferred our decision in the appeals now before us pending action by the Supreme Court on a pending petition for certiorari in *Wells*, which involves the same statute. The Supreme Court declined review on March 21, 1972. 405 U.S. 995, 92 S.Ct. 1271, 31 L.Ed.2d 464.

In M. A. P. v. Ryan, 285 A.2d 310 (D.C.App.1971) the court stated:

> As this court on February 1, 1971 became the highest court of the District of Columbia, no longer subject to review by the United States Court of Appeals, we are not bound by the decisions of the United States Court of Appeals rendered after that date. *With respect to decisions of the United States Court of Appeals rendered prior to February 1, 1971, we recognize that they, like the decisions of this court, constitute the case law of the District of Columbia.* As a matter of internal policy, we have adopted the rule that *no division of this court will overrule a prior decision of this court or refuse to follow a decision of the United States Court of Appeals rendered prior to February 1, 1971, and that such result can only be accomplished by this court en banc.*

*Id.,* at 312. (Emphasis added.) As Judge Wright succinctly stated in United States v. Thompson, 147 U.S.App.D.C. 1, 10, 452 F.2d 1333, 1342 (1971), "[t]he overriding purpose which emerges from the [Court Reform] Act is to put the District's judicial system on a par with those of the states."

It is equally obvious that the transitional period, in which shifts of jurisdiction occur, will be a difficult one. As one law review author expressed:

> [T]he transitional period will require that the courts in the District, local and federal, adopt a self-imposed hierarchy for the resolution of competing notions of local law, a new doctrine of abstention in yet another exercise of judicial discretion and restraint.

Williams, District of Columbia Court Reorganization, 1970, 59 Geo.L.J. 477, 497 (1971). The realities of the situation require the judges of this court to abstain from acting in cases now within the ambit of review by the District of Columbia Court of Appeals. It is only through such restraint and abstention that we can make the jurisdictional realignment of the local courts a reality and assure the realization of the goals set out by the Court Reform Act. We must be willing to realize and appreciate the role that the respective courts are now to play.

> The Court Reform Act unequivocally distributed the "judicial power in the District of Columbia" between the federal courts and the District of Columbia courts, allotting to each its own sphere and making neither subservient to the other.

M. A. P. v. Ryan, *supra,* 285 A.2d at 313.

Our willingness to accept this change in the local court organization is, of course, important to the ultimate success of the Court Reform Act. Change is nothing new to the law—this is a profession based on the proposition of orderly change—and it is change which both gives strength to the law and allows it to remain a viable and living force in our modern and complex society. As Mr. Chief Justice Burger stated in his first State of the Judiciary address:

> I have great confidence in our basic system and its foundations, in the dedicated judges and others in the judicial system, and in the lawyers of America. Continuity with change is the genius of the American system, and both are essential to fulfill the promise of equal justice under law.

Burger, The State of the Judiciary— 1970, 56 A.B.A.J. 929, 934 (1970). Only by living up to the Chief Justice's confidence can we satisfy the ultimate goal of an efficient system of justice for the District of Columbia.